## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4677 | **DATE** | 11/23/2004 |
| **CASE TITLE** | John Hanno & Christina Reitz vs. Michael F. Sheahan, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 1/11/2005 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendant's motion for summary judgment (Doc. No. 49-1) is granted in part and denied in part. Counts IV, VII, XII, XV, and XIX are dismissed. Count III and Count XII survive Defendant's motion for summary judgment.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | 4 number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | NOV 3 0 2004 date docketed | 66 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 11/23/2004 date mailed notice | |
| ETV | courtroom deputy's initials | U.S. DISTRICT COURT 2004 NOV 24 PM 1:02 Date/time received in central Clerk's Office | ETV mailing deputy initials | |

| | | |
|---|---|---|
| JOHN HANNO & CHRISTINA REITZ, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 01 C 4677 |
| | ) | |
| MICHAEL F. SHEAHAN, SHERIFF OF | ) | |
| COOK COUNTY, JOHN DOES 1-20, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| | ) | |
| Defendants. | ) | |

NOV 2 9 2004

## MEMORANDUM OPINION AND ORDER

Plaintiffs John Hanno and Christina Reitz brought this action under 42 U.S.C. § 1983, claiming that Cook County Sheriff's deputies violated their rights under the Fourth, Fifth, and Eighth Amendments, in the course of effectuating an eviction order. Plaintiffs allege that the officers barged into their home, searched their bodies and their home for weapons, refused to allow Reitz to sit down or call an ambulance when she suffered a heart attack, and stole $1000 cash and various items of jewelry from their home.[1] Sheriff Sheahan now moves for summary judgment, arguing that the evidence does not establish any constitutional violations and that, even if the deputies violated Plaintiffs' rights, there is no basis for a judgment against the Sheriff under the *Monell* doctrine. For the reasons set forth here, Defendant's motion is granted in part and denied in part.

## FACTUAL BACKGROUND

On April 27, 2000, an Illinois state court issued an order for possession of the premises at 6 North Trail, Lemont, Illinois (the "residence") in favor of TCF Bank in a mortgage foreclosure action. (Defendant's Local Rule 56.1(a) Statement, hereinafter, "Def.'s 56.1(a)" ¶ 1.) The order

---

[1] Although Plaintiffs learned the identities of the individual deputies two years ago, they never amended their complaint to name them as individual defendants. Defendant Michael F. Sheahan, the Sheriff of Cook County, is, therefore, the only Defendant before the court.



named both John Hanno, who owned the house, and Christina Reitz, who lived with him. (*Id.* ¶ 4; Ex. C to Defendant's Motion for Summary Judgment, hereinafter, "Def.'s Mem.," at 5.)

Plaintiffs were present at their residence on June 21, 2000 when Deputies Matthew Manion and Brian Davenport of the Cook County Sheriff's Department arrived with a crew of three private movers to evict Plaintiffs. (Plaintiffs' Local Rule 56.1(a) Statement, hereinafter, "Pls.' 56.1(a)," ¶ 3.) Plaintiffs awoke that morning to the sound of the police pounding on the back door. (*Id.* ¶¶ 30, 31.) When Plaintiffs opened the door to investigate, the two deputies along with two others[2] "barged in" without announcing themselves or their purpose. (*Id.* ¶¶ 32, 33, 35.)[3] The police wore bullet-proof vests and carried guns as they entered the residence. (*Id.* ¶ 33.) Yelling at Plaintiffs in a "rough, angry voice," they ordered Plaintiffs to stand up against a wall with their hands raised. (*Id.* ¶¶ 34, 36.) According to Hanno, "it felt like a drug raid." (*Id.* ¶ 37.) Plaintiffs were never handcuffed, however, were not given *Miranda* warnings, and were never told they were under arrest. (Def.'s 56.1(a) ¶¶ 9, 10, 11.) Plaintiff Hanno saw the officers' weapons, but they were never drawn. (*Id.* ¶ 12; Plaintiffs' Response to Def.'s 56.1(a), hereinafter, "Pls.' Res.," ¶ 12.) At no point did the deputies physically touch the Plaintiffs. (Def.'s 56.1(a) ¶ 6.)

Plaintiffs note that the eviction order in the deputies' possession named only two people as residents, and that Plaintiffs confirmed, in response to the deputies' questions, that they were the only two persons there. (Pls.' 56.1(a) ¶ 39.) They note, further, that the search of the residence occurred after Plaintiffs had assured the police that no weapons were on the premises and that the

---

[2]      The record does not identify the other two individuals that entered the residence; the court presumes that they were private movers.

[3]      Defendant disputes this, insisting that the officers first attempted to enter through the front door. Only when they received no response, Defendant asserts, did the officers move around to the back door, where Hanno let them in after they knocked. (Def.'s 56.1(a) ¶ 5.) Defendant also asserts that the officers were in uniform and announced their purpose at the door with a copy of the court order in hand. (Defendant's Response to Pls.' 56.1(a), hereinafter, "Def.'s Res.", ¶ 35.) On this motion, the court resolves all these disputes in favor of the non-moving parties. *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003).

police had no reason to believe this was untrue. (*Id.* ¶ 40.) The officers nevertheless conducted a full search of the house pursuant, according to the deputies' deposition testimony, to Department policy. (Pls.' 56.1(a) ¶¶ 38, 40, 41.) As the officers conducted the search, Plaintiffs heard things falling and boxes being opened. (*Id.* ¶¶ 42, 43, 44.) According to Plaintiffs, "the Sheriffs systematically opened and searched" each of the boxes Plaintiffs had packed for their move. (Hanno Dep., at 40-41; Pls.' 56.1(a) ¶ 43.) Defendant denies that the officers opened sealed boxes during their search, but they admit that it is Department policy to search closed compartments during the course of executing an eviction. (Def.'s Res. ¶ 43, 44; Pls.' 56.1(a) ¶ 45.) After searching the house, one of the officers searched a car belonging to Reitz.[4] (Pls.' 56.1 ¶ 46.)

At some point during the encounter, Reitz became extremely upset and began to cry. (*Id.* ¶ 52.) Concerned about the effect of the stressful situation on Reitz's health, and aware that she suffers from hypertension, Hanno attempted to inform the officers of Reitz's medical condition and request that they allow her to leave, but the deputies interrupted, telling him to "shut up." (*Id.* ¶¶ 53, 55.) Only after the search of the residence did the police allow the Reitz and Hanno to step away from the wall and move out to the front porch. (Def.'s Res. ¶ 54.)

Shortly after moving out to the front porch, Reitz suffered from a burst blood vessel and lung hemorrhaging and collapsed. (Pls. 56.1(a) ¶ 58; Reitz Dep., at 43-44.) According to Hanno, Reitz "was having a severe attack. She couldn't stand up. She couldn't sit down. She couldn't lay down. She was somebody that was - she was screaming in agony is what she was doing." (*Id.* ¶ 64.) Plaintiffs assert that the officers refused to allow Reitz to obtain blood pressure medicine from her purse. (Pls.' 56.1(a) ¶ 59.) Plaintiffs also claim that the police initially refused to summon medical help, and only relented "after Mr. Hanno repeatedly begged the officers to call an ambulance." At some point, one of the officers did summon an ambulance, (Pls.' 56.1(a) ¶ 62;

---

[4]     Although the parties agree that a car was searched, the court is uncertain whether the car belonged to Hanno or Reitz. (Pls.' 56.1(a) ¶ 46; Def.'s Res. ¶ 46; Hanno Dep. at 79.)

Hanno Dep., at 50-51), but Plaintiffs contend that due to the deputies' initial refusal to call for medical assistance, "Ms. Reitz suffered from her heart attack[5] for 15 minutes before an ambulance arrived, despite the fact that the nearest hospital was just down the road." (*Id.* ¶ 62; Reitz Dep., at 43-44.) The ambulance crew refused to permit Hanno to ride along with them to the hospital and the deputies, who had seized Plaintiffs' car keys, also refused to allow Hanno to leave and accompany Reitz to the hospital. (*Id.* ¶ 65.)

Plaintiffs testified that in the course of their search, the police "ransacked" their home. (Pls.' 56.1(a) ¶ 42.) In his deposition, Hanno states, "Every one of our boxes--every one of our drawers, every possession, every basket, every laundry basket was opened up, every single thing." (Hanno Dep., at 83.) Reitz echoes these claims, testifying that "My purse had been gone through and every single thing was taken out and spread across the counter top with all the other papers, and my business cards were taken out." (Reitz Dep., at 50.) Reitz also alleged that she lost other, less valuable items: "I had like crystals that were on my windows in my bedroom, not worth a lot in money, but to me they were. I had a key chain that I had hanging on the crank to the window in my bedroom, not really valuable except to me that I never got back, things that were little things that might be touching to your heart." (*Id.* at 52.)

Plaintiffs assert that in addition to the items identified above, the officers "did locate several of the Plaintiffs' valuables, including Ms. Reitz's antique family jewelry, and Mr. Hanno's 15th Anniversary ring, which the Plaintiffs never recovered." (*Id.* ¶ 67; Hanno Dep., at 59, 75-75; Reitz Dep., at 48-50.) Plaintiffs did not personally witness the deputies steal their property, but Hanno testified in his deposition as to the basis for his inference that they are guilty of theft: "I saw them [the deputies] searching all our belongings and then the stuff was missing, so I assume they stole.

---

[5]     Defendant disputes Plaintiffs' characterization of Reitz's malady as a "heart attack." (Def.'s Res. ¶ 62.) Although Hanno testified that Reitz initially appeared to be suffering from a heart attack (Hanno Dep., at 49-50; Reitz Dep., at 40), later testing showed that Reitz had suffered a burst blood vessel and lung hemorrhaging. (Reitz Dep., at 43-44.)

. . . They were in the house. We had the stuff before they came in the house. They came in, searched our belongs, and left. And when we went back into the house, the stuff was missing." (Hanno Dep., at 50.) According to Plaintiffs, the movers who accompanied the deputies to the scene "helped rescue some of the valuable property from the clutches of the sheriffs." (*Id.* ¶ 71.) Hanno testified that at some point while he was standing out on the front porch, a mover brought a milk carton full of coins out of the house and gave it to Hanno to protect from the police. (*Id.* ¶ 72.) Plaintiffs also note that the movers used care in removing the furniture, which they contrast with the behavior of the police who were, according to Hanno, "trying to steal our valuables and terrorize us." (*Id.* ¶¶ 73, 74.)

The officers admit that even after conducting a thorough search of the residence, they failed to locate any weapons or other contraband, (Pls.' 56.1(a) ¶ 66), but Defendant disputes Plaintiffs' allegations of theft. Both deputies denied taking any cash or valuables from the residence. (*Id.* ¶ 69; Def.'s 56.1(a) ¶ 18.) Defendant also stresses that "neither plaintiff saw anyone physically take their property, never saw anyone take and keep any property." (Def.'s Res. ¶ 67.) Rather, Plaintiffs only assume that the officers stole their belongings; they have no direct evidence to support this assumption. (*Id.* ¶¶ 68, 69.) The eviction resulted in Plaintiffs' property being put outside of the home, leading Deputy Davenport, one of the two Sheriff's deputies who searched the residence, to surmise that the items might have been stolen after the police had completed the eviction and left the residence: "Everything [in the house] is put out in front of the premises. After we leave I don't know what happens to it, whether the defendants take it, or it is stolen." (Davenport Dep., at 54.) Finally, Defendant claims that the movers were not motivated by police misconduct when they gave Plaintiffs certain valuable property; as Defendant notes, Hanno testified that the movers told him, "You better put this away so nobody takes it," not that "You better put this away so the police don't take it." (*Id.* ¶ 71.)

In making their section 1983 claim, Plaintiffs allege that the officers were acting pursuant

5

to and in accordance with the policies and practices of the Cook County Sheriff's Department. Hanno testified that the deputies "were trying to steal our valuables and terrorize us," stating that they appeared to be operating as part of a "regular routine" or "mode of operation." (Pls.' 56.1(a) ¶¶ 74, 75.) He described the police behavior as "perfectly planned": "The only thing I can say is the way that they operated, it was a regular - it was perfectly planned. It was like swat team came in there, and they did what they did, stole our belongings, cleared out without - they didn't even worry about moving our stuff out of the house." (*Id.* ¶ 76; Hanno Dep., at 68.) Plaintiffs also note that Officer Davenport testified that he had performed thousands of evictions, described this one as "like any other eviction," (*Id.* ¶ 77; Davenport Dep., at 63), and was not disciplined for his conduct in this incident. (*Id.* ¶ 87, 88.)

Officer Matthew Manion, the other deputy involved in the search, similarly testified that it is the policy of the Cook County Sheriff's Department to search for weapons during the course of an eviction without a search warrant. (*Id.* ¶ 81.) The existence of such a policy is further corroborated by the Eviction Unit Worksheet used by the Department, which requires the officer to note any "Weapons/Contraband Seized." (*Id.* ¶ 85.) According to Defendant, this policy of searching the premises for weapons and contraband during an eviction is motivated by concerns "for officer safety and for public safety." (Def.'s 56.1(a) ¶ 29.) Officer Manion also testified that it is his practice to monitor private movers who are present at the eviction. (Pls.' 56.1(a) ¶ 86.) He admitted, however, that the Department does not inventory property removed from the house in the course of evictions. (*Id.* ¶ 82.)

## DISCUSSION

I. **Plaintiff's Allegations**

On June 20, 2001, Plaintiffs filed this lawsuit under 42 U.S.C. § 1983, claiming that the Cook County Sheriff's Department violated their constitutional rights during the eviction. In an

amended complaint, filed on April 8, 2002, Plaintiffs alleged more specifically that the deputies acted pursuant to Cook County Sheriff's Department policy when they violated Plaintiffs' Fourth, Fifth, and Eighth Amendment rights during the course of evicting them from their home. Five of the seventeen counts, Counts IV, VIII, XI, XV, and XIX, are brought against the unidentified Sheriff's deputies present at the scene, but as those officers have never been named or served, those counts are dismissed.

Plaintiffs also sue Cook County Sheriff Michael Sheahan in his official capacity, alleging that the County is liable for the constitutional violations alleged here because the Department's policies and customs authorize the misconduct and because Sheriff Sheahan failed to train, supervise and/or discipline his officers. Counts I-IV are directed at the allegedly unconstitutional search of Plaintiffs' car. Counts V-VIII focus on the search of Plaintiffs' "desk drawers, sealed boxes, and other enclosures." Counts IX - XII involve allegations of excessive force and unreasonable restraint of liberty. Counts XIII - XV focus on the officers' alleged theft of Plaintiffs' personal property.[6] Count XVI[7] alleges that the Sheriff's policy of failing to train and/or supervise his officers "to distinguish evictions for arrests and other criminal operations" led to a violation of their Eighth Amendment rights through the officers reckless disregard for Plaintiffs' health while in police custody during the eviction.

## II.    Summary Judgment Standard

As noted, Defendant Sheahan moves for summary judgment. He argues, first, that there were no violations of Plaintiffs' constitutional rights. Even if such violation is established, the Sheriff contends, that Plaintiffs have not presented any evidence linking their alleged injuries to an express

---

[6]      The court notes that Count XI is identical to Count III, perhaps due to a typographical error.

[7]      The Plaintiffs do not bring any claims identified as Counts XVII and XVIII, though they did label their final claim against the individual officers XIX.

policy or widespread practice or custom of his department, nor have they presented evidence that he, as a final policymaker, directly caused a constitutional injury. (Defendant's Memorandum in Support of Motion for Summary Judgment, hereinafter, "Def.'s Mem.," at 3-4.)

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is only appropriate "if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003) (quoting *Commercial Underwriters Ins. Co. v. Aires Envtl. Servs., Ltd.*, 259 F.3d 792, 795 (7th Cir. 2001)). Although in doing so, the court will construe all inferences in favor of the non-moving party, the court is "not required to draw every conceivable inference from the record." *McDonald v. City of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004), quoting *Rogers*, 320 F.3d at 752; *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004). Thus, "[i]nferences that are supported only by conjecture or speculation will not defeat a summary judgment motion." *Id.*

### III.    Were Plaintiffs' Constitutional Rights Violated?

In order to proceed against the Cook County Sheriff, Plaintiffs must first establish a violation of their constitutional rights. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (jury's finding that the police officer inflicted no constitutional injury on the plaintiff removed any basis for liability against the city and its police department); *Tesch v. County of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998) ("A failure to train or a failure to institute a municipal policy theory requires a finding that the individual officers are liable on the underlying substantive claim.") Plaintiffs assert that there are disputes of material fact concerning three separate types of constitutional violations: (1) an unreasonable search and seizure of Plaintiffs, the residence, and their car in violation of the Fourth Amendment; (2) reckless disregard for the health and welfare of Plaintiffs in violation of the

Eighth Amendment; and (3) an unlawful conversion of property in violation of the Fourth and Fifth Amendments. The court addresses these claims in turn.

## A. Fourth Amendment Search and Seizure

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, . . . ." U.S. CONST. amend. IV. In general, a warrantless seizure is unreasonable, except where "special law enforcement needs" require such a seizure. *Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (quoting *United States v. Place*, 462 U.S. 696, 701 (1983)). The reasonableness inquiry requires a "careful balancing of governmental and private interests," specifically, a balance of "the need to search against the invasion which the search entails." *New Jersey v. T.L.O.*, 469 U.S. 325, 335, 341 (1985). Defendant argues that no Fourth Amendment "seizure" occurred during the eviction and that, even if Plaintiffs were seized, the seizure was reasonable, given the potentially volatile circumstances and threat to officer safety.

### 1. "Seizure" of Plaintiffs

In *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), the Supreme Court held that a Fourth Amendment seizure occurs "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." (Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment, hereinafter, "Pls.' Mem.," at 1.) Among the factors indicating that a seizure has occurred, the Court explained, are: (1) the threatening presence of several police officers; (2) the display of a weapon by an officer; (3) physical touching of the person; and (4) the use of language or tone indicating that compliance with the officer's request might be compelled. *Id.* at 554 (citations omitted). Absent such factors, the Court held, "otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Id.* at 555. In this case, although

no physical contact occurred and the police did not brandish their weapons, two armed officers clad in bullet-proof vests "barged" into Plaintiffs' residence. In a "rough and angry voice," the officers directed Plaintiffs to stand for several minutes with their hands against the kitchen wall while they searched their home. According to Plaintiffs, the officers prevented Plaintiffs from leaving by seizing their car keys and refusing their repeated requests to leave the house. Plaintiffs argue that on these facts, a jury could conclude that "a reasonable person would have believed he was not free to leave." *Mendenhall*, 446 U.S. at 554; *see also United States v. Drayton*, 536 U.S. 194, 201 (2002) ("If a reasonable person would feel free to terminate the encounter, then he or she has not been seized."). Although a jury might conclude that no seizure took place under these circumstances, the court is not prepared to conclude that there are no disputes of fact on the issue. For purposes of summary judgment, the court will assume that a seizure did occur.

## 2.    Reasonableness of the Seizure

Defendant argues that, if there was a seizure here, the officers effected that seizure within the exception for "special law enforcement needs." The cases he cites, however, all involve circumstances where officers suspected unlawful conduct. For example, in *Illinois v. McArthur*, law enforcement officers suspected a man of having hidden marijuana in his home, and detained him for two hours while they obtained a search warrant. *McArthur*, 531 U.S. at 328-329. In concluding that McArthur's two-hour seizure did not violate the Constitution, the Court noted that the police had probable cause to believe the home contained contraband and that the homeowner would destroy the contraband before the police were able to obtain a warrant. *Id.* at 333. Neither of these factors is present here, where any suspicion the officers may have had that they would find weapons or contraband inside Plaintiffs' residence did not rise to the level of probable cause. The *McArthur* Court observed, further, that the police did not search the home at all, nor arrest McArthur, before obtaining a warrant, and held him for only two hours. *Id.* at 333. Here, the officers restrained

Plaintiffs for less time, but proceeded with an unwarranted search and required them to remain in an awkward position, standing against a wall with their hands raised, until the search was complete.

The facts of *White v. City of Markham*, 310 F.3d 989 (7th Cir. 2002), are closer to those presented here, but in that case the individuals targeted for eviction from their apartment argued that being ordered to *leave* their home constituted a seizure. The Seventh Circuit expressed some doubt that being excluded from premises constitutes a seizure; assuming there was a seizure, the court found it justified by a dangerous altercation between the tenants and their landlord, and the hazards generated by a reconstruction project on the site. *Id.* at 996. No such circumstances existed in this case.

Defendant also appears to suggest that where police are acting pursuant to a court order, Plaintiffs have the burden of showing that the manner in which they carried it out was unreasonable. (Defendant's Reply to Plaintiffs' Memorandum in Opposition to Summary Judgment, hereinafter, "Def.'s Reply," at 4.) The cases Defendant cites for this proposition, however, simply restate the Fourth Amendment unreasonableness test and do not create such a burden-shifting rule. Indeed, one case Defendant cites, *Specht v. Jensen*, 832 F.2d 1516 (10th Cir. 1987), supports Plaintiffs' contentions. In *Specht*, plaintiffs alleged that police officers violated the Fourth Amendment when they relied on a court repossession order to conduct a warrantless search of their home. *Specht*, 832 F.2d at 1520. The Tenth Circuit held that police officers who conducted a search of plaintiff's home and office under a court order of possession and writ of assistance violated the Fourth Amendment, regardless of whether their reliance on the court order was objectively reasonable. *Id.* at 1522-23. The court observed that "although good faith may shield individual actors from liability in appropriate cases, no specific mental state is required to violate the Fourth Amendment." Accordingly, the court rejected the argument "that no constitutional violation occurred because the officers in this case were merely negligent in relying upon a repossession order to conduct the office and home searches." *Id.* at 1523. If what Defendant is

suggesting is that the officers' reliance on the court eviction order somehow changes the Fourth Amendment unreasonableness inquiry, *Specht* provides no support. Rather, it suggests that the presence of a court eviction order is irrelevant. The other case cited by Defendant for this proposition, *Fuentes v. Shevin*, 407 U.S. 67 (1972), does not involve the Fourth Amendment, but rather examines the procedural due process requirements of state replevin statutes.

Defendant cites a host of cases in which courts have upheld warrantless searches and seizures. Each of those cases, however, involved either some evidence of individual criminality or wrongdoing, *e.g., Michigan v. Summers*, 452 U.S. 692 (1981) (it is constitutionally reasonable for an officer to require a citizen to remain while executing a valid warrant to search his home), an immediate and important government interest, *e.g., Michigan Dep't of State Police v. Sitz*, 496 U.S. 444 (1990) (the government interest in the prevention of drunk driving legitimated suspicionless traffic stops at a drunk driver checkpoint); or an overriding concern for officer safety, *e.g. Summers*. Each of these considerations is absent here. In *Sitz*, the Supreme Court stressed both the importance of the government's interest in preventing drunk driving and the minimal duration of the traffic stops (average delay was 25 seconds) in upholding the suspicionless stops. *Sitz*, 496 U.S. at 448, 451. In *Summers*, the Court characterized the existence of a search warrant as of "prime importance in assessing the intrusion" and the defendant's brief seizure. Such police efforts were necessary to officer safety, the Court observed: "Although no special danger to the police is suggested by the evidence in the record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Id.* at 702. Although Defendant is likely correct that tensions are high during a court-ordered eviction, as well, (Def.'s Reply, at 3), the court is not prepared to accept the proposition that any eviction justifies the seizure of the homeowner's person without any inquiry into the reasonableness of the measures.

Defendant also cites *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny. In *Terry*, the

12

Supreme Court declared that the Fourth Amendment is not violated when police perform a "stop and frisk" on a reasonable suspicion that such a brief stop is intrusion is necessary. *Terry* does not give police carte blanche to stop and frisk any person with whom they come into contact, however; rather, the court held that "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. Defendant here points to no reasonable or articulable basis for a concern that Plaintiffs posed a risk to officer safety.[8] Instead, Defendant vaguely notes that a forcible eviction under court order presents a potentially volatile situation. As noted, this is undoubtedly true, but *Terry* requires more: a reasonable and articulable suspicion. *Terry*, 392 U.S. at 21.

Finally, Defendant cites *Watson v. Marsh*, 98 Fed. Appx. 526, 2004 WL 868676 (7th Cir. 2004), in which the Seventh Circuit held police did not use unreasonable force when they handcuffed a homeowner in the course of a forcible eviction. In that case, however, the police were reacting to the homeowner's threat to "defend [her] property including using Deadly Force." *Id.* at 52. Plaintiffs here made no such threat and, at least according to Plaintiffs, the police had no reason to suspect that they were armed or posed a threat to officer safety.

Defendant has suggested that the presence of the eviction order alone gave the police the right to detain Plaintiffs, but this court concludes that the presence of an eviction order does not end the Fourth Amendment reasonableness inquiry. The Fourth Amendment requires police to make some individualized showing of probable cause or reasonable suspicion prior to a seizure.

---

[8]      Defendant also cites *United States v. Menard*, 95 F.3d 9 (8th Cir. 1996), in which the Eighth Circuit upheld a pat-down search of a car passenger based, in part, on the fact that the driver was found to be armed after consenting to a pat-down search. *Menard* states that "Fourth Amendment reasonableness does not require 'that a policeman must feel 'scared' by the threat of danger." *Id.* at 11 (quoting *United States v. Tharpe*, 536 F.2d 1098, 1101 (5th Cir. 1976)). The facts of *Menard*, involving "a lonely road, late at night, a traffic violation, and suspected drug trafficking by a passenger found to be carrying a concealed weapon," are a far cry from the routine eviction before the court here. *Id.* at 12.

Disputes of material fact remain here on the basis of the seizure of Plaintiffs. Absent any articulable basis for the seizure, a reasonable jury could find that, despite its limited duration and scope, the seizure was unreasonable under the Fourth Amendment.

### 3.    Search of Residence and Car

In addition to challenging the seizure of their persons, Plaintiffs claim that the officers violated the Fourth Amendment by searching their car (Counts I, II, and III) and their residence (Counts V, VI, and VII). Defendant argues that Plaintiffs have not shown that the officers' search of their residence and car during the eviction was unreasonable in light of the legitimate concern for the safety of law enforcement officers in a potentially volatile situation.

In support of their unlawful search claims, Plaintiffs cite *Maryland v. Buie,* 494 U.S. 325 (1990). (Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment, hereinafter, "Pls.' Opp.," at 9.) In *Buie,* a homeowner argued that police violated the Fourth Amendment when, in the course of carrying out an arrest warrant, they conducted a protective sweep of his home and found, in plain view, a sweatsuit linking their suspect to the crime in question. 494 U.S. at 328. In response to a motion to suppress, the State of Maryland argued that the police should be permitted to conduct a protective sweep whenever they make an in-home arrest for a violent crime, or, in the alternative, that protective sweeps fall within the *Terry* doctrine. *Id.* at 330. The Supreme Court rejected both approaches, holding that the Fourth Amendment requires some showing of probable cause or reasonable suspicion in order to conduct anything more than a cursory search for possible accomplices:

> We also hold that as an incident to the arrest the officers could, as a matter of precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Id.* at 334. In rejecting any "bright line" rule authorizing frisks in all confrontational encounters, the court stressed that "even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted. That approach is applied to a protective sweep of the house." *Id.* at 334, n.2. Indeed, the Supreme Court has stated that the specific reason for the officer's entry does not alter the Fourth Amendment reasonableness analysis, nor does the fact that the seizure did not follow a search. *Soldal*, 506 U.S. at 68-69. Because of this, "the right against unreasonable seizures would be no less transgressed if the seizure . . . was undertaken to collect evidence, verify compliance with a housing regulation, *effect an eviction by the police*, or on a whim, for no reason at all." *Id.* at 69. Continuing, the Court noted that "it would be 'anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.'" *Id.* (quoting *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 530 (1967)).

Defendant fails to cite any authority supporting his claim that the thorough search of the residence was reasonable. Rather, he loosely argues that the eviction order itself gave the police the right and, in fact, the duty, to search Plaintiffs' belongings during the eviction process. Without citing any authority, he asserts that the police had "a duty to the public in general to avoid putting dangerous things out on the public way by searching and locating hazards and weapons." (Def.'s Reply, at 5.) But the order itself does not instruct the police to conduct a search, nor does it indicate that the police have the right to conduct such a search. (Ex. C to Def.'s Motion for Summary Judgment.) Although the eviction order gave police the right to remove, or supervise the removal of, Plaintiffs' belongings from the residence, Defendant has not demonstrated that it

authorized them to conduct a thorough search of the residence or of the car.[9] Nor did it give them the right to open and examine the contents of sealed containers absent a "reasonable, individualized suspicion" justifying the search. *Buie*, 494 U.S. at 334 n.2. As noted earlier, in his testimony concerning the disposition of Plaintiffs' belongings, Deputy Davenport perhaps inadvertently referred to them as "defendants." Davenports' use of that term arguably reflects the attitude of the Sheriff's Department during civilian evictions.

### B. Reckless Disregard for Plaintiffs' Health and Welfare

In Count XVI, Plaintiffs bring a claim under the Eighth Amendment alleging that the officers used excessive force and showed a reckless disregard for Plaintiffs' health and welfare during the eviction. Defendant again denies that Plaintiffs' constitutional rights were infringed, arguing that at no point did the police interfere with Plaintiffs' ability to care for themselves.

The Eighth Amendment imposes upon the State a duty to assume responsibility for the health and welfare of those persons which it takes into custody. *See e.g.*, *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) ("when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basis human needs--e.g., food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.") This duty, however, is only violated by deliberate indifference to serious medical needs. In the medical context, "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). In order to state a valid claim, a person "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106.

---

[9]     Indeed, Defendant makes no effort to justify the officers' search of Plaintiffs' car.

In support of their Eighth Amendment-based section 1983 claim, Plaintiffs cite the officers' indifference to Reitz's apparent heart attack and refusal to (1) retrieve her medicine or (2) call an ambulance. (Pls.' Res., at 14.) Plaintiffs also allege that they were restrained by the officers, rendering them unable to care for their own medical needs. Given these facts, a reasonable jury could find that the officers' actions went beyond inadvertence to deliberate indifference to Reitz's medical needs and therefore violated her Eighth Amendment rights. Hanno's Eighth Amendment rights were not infringed, however, as he suffered no medical injury. Defendant's motion for summary judgment is granted with respect to Hanno's Eighth Amendment claim, but denied with respect to Plaintiff Reitz.

## C.     Conversion of Plaintiffs' Property

In Counts XIII and XIV, Plaintiffs allege that the officers violated the Fourth and Fifth Amendments by stealing items of their personal property seized during the eviction. Defendant asserts that Plaintiffs have not submitted sufficient evidence that the officers deprived them of their property. In any event, he argues that intentional deprivations of property caused by unauthorized acts of state or county officials do not give rise to section 1983 liability "so long as state courts provide an adequate post-deprivation remedy." (Def.'s Reply, at 9 (citing *Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir. 1996)).)

Plaintiffs do not respond to these arguments. They offer no direct evidence that the officers stole their property during the course of the eviction and they admit that they did not actually see the officers take their property. Instead, Plaintiffs base their claim on the assumption that it must have been the police, not the movers, who were responsible for the missing items. Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an essential element for which they bear the burden of proof at trial. In order to do so, "a party must present more than mere speculation or conjecture to defeat a

summary judgment motion." *Sybron Transition Corp. v. Security Ins. Co. of Hartford*, 107 F.3d 1250, 1255 (7th Cir. 1997). Where a plaintiff fails to present sufficient evidence, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Plaintiffs' failure to offer any evidence of the officers' misconduct beyond their own supposition might be sufficient basis for entry of summary judgment against them on this claim.

Even if Plaintiffs' assumptions were sufficient to overcome summary judgment, Defendant correctly contends that a section 1983 claim cannot be brought against the Sheriff if the state has provided for a legal remedy. (Def.'s Reply, at 9-10.) In *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986), the Supreme Court held that a prison inmate could not bring a section 1983 claim to recover for lost property, despite having been deprived of property under color of state law, because the deprivation did not occur without due process of law insofar as the state provided a means by which the plaintiff could remedy his loss via a tort claim. *Id.* at 543. Three years later, the Court extended this doctrine, holding that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (dismissing a section 1983 claim filed by an inmate claiming that a prison official had conducted a "shakedown" of his cell in light of the availability of adequate remedies under state law).

Here, Illinois provides a tort remedy for property deprivations. *See* 735 ILL. COMP. STAT. 19-101 (1982) (a person entitled to possession of "goods or chattels" may sue in *replevin* for their

recovery). Plaintiffs have not suggested that this remedy is inadequate.[10] Counts XIII and XIV are therefore dismissed without prejudice to any state law remedies that remain available to them.

## IV.   Standards for Municipal Liability

Having concluded that there are disputes of material fact concerning both Plaintiffs' Fourth Amendment claims and Plaintiff Reitz's Eighth Amendment claim, the court turns to the issue of municipal liability—that is, whether the Cook County Sheriff is liable, in his official capacity, for the acts of the deputies.   Although the Supreme Court has held that local government units are "persons" subject to suit under section 1983, it has rejected the application of *respondeat superior* liability to hold government units responsible for the constitutional violations of their agents. *Monell v. Department of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978).   Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.   Three situations exist where a municipality violates a constitutional right:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with "final policymaking authority."

*Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 735 (7th Cir. 1994).   Put another way, in order to state a claim against a municipality under section 1983, the plaintiff must also show that the municipality was the "moving force" behind the alleged injury "through its *deliberate* conduct." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997).

Plaintiffs argue that the Sheriff is liable for Fourth and Eighth Amendment violations under

---

[10]    In addition, although Plaintiffs' attempt to establish municipal liability by alleging that the thefts occurred pursuant to a Department custom of tolerating the misappropriation of property and failing to discipline such thefts, they fail to present any evidence that this was anything other than an isolated incident, if it did occur.

the second prong of the *Monell* test. They articulate two theories under that prong: a custom or practice of condoning unconstitutional behavior and a failure to train or supervise. As explained below, the court is not persuaded that either of these theories supports the conclusion that Sheriff Sheahan is liable for unlawful seizure or for deliberate indifference to Plaintiffs' health and safety. Nevertheless, although Plaintiffs have not explicitly relied on the "express policy" prong of the *Monell* test, the court concludes that the Sheriff may be liable under that prong for the unlawful search of Plaintiffs' residence and property.

## A.    Search

In Plaintiffs' view, ample evidence exists that the officers acted pursuant to a policy, custom or widespread practice in conducting the illegal search and seizure during the eviction. With respect to the search itself, the court agrees that the deputies' search of the premises may be a function of official department policy. Officers Manion and Davenport admitted to routinely searching homes in the course of evictions without a search warrant and without any *Terry*-style inquiry into reasonable suspicion. (*Id.* at 13.) Moreover, each admitted that such searches of residences and cars were part of their "practice," an admission underscored by the existence of eviction worksheets on which the officers are expected to identify any persons arrested and any contraband confiscated during the course of an eviction. (*Id.*) The officers both testified that they had received training from the department on proper eviction procedure. (Davenport Dep. at 12; Manion Dep. at 8.) Officer Manion testified, further, that it was department policy to search for weapons during evictions as a matter of course, with or without a search warrant. (Manion Dep. at 14-15.) This policy, according to Manion, extended to the searching of closed drawers, cabinets, and sealed boxes. (*Id.* at 15.) Such evidence of a department policy of conducting warrantless searches during evictions is sufficient to establish municipal liability under section 1983 in regard to the Fourth Amendment unreasonable search claims. (Complaint, Counts III and VII).

20

## B.    Seizure

In addition to their warrantless search claim, Plaintiffs have argued that their seizure during the duration of the search was improper and that the Sheriff had a custom of tolerating the use of excessive force during an eviction. (*Id.* at Count XI.)[11]  Here, the evidence of a policy or custom is insufficient, in the court's view, to survive summary judgment.  Plaintiffs have presented no evidence of bad faith nor of any pattern of similar misconduct.  They merely offer the unsupported assertion that it was department policy "to move people being evicted out of the house and not allow them back in during the eviction" and "to leave any medication found in the search in the house." (Pls.' Opp., at 13.)  With respect to the argument that there was a policy " to move people being evicted out of the house," the court notes simply that the very purpose of an eviction is to move people out of their homes and not permit them to return.   A policy of carrying out a lawful eviction order does not violate the Constitution.  Nor have Plaintiffs offered any evidence in support of their suspicion that there was an official policy of leaving prescription medications inside the home following an eviction.  The fact that Sheriff Sheahan failed to discipline the officers involved in the eviction is obviously insufficient for this purpose; there is no indication in the record that Sheahan himself, or any of the deputies' supervisors, were made aware of the purported misconduct.  Nor have Plaintiffs shown that what happened in this incident was anything more than an isolated incident.

Plaintiffs invite the court to conclude that the Sheriff's failure to discipline the deputies is sufficient to establish a liability.  The court declines the invitation.  Although some Circuits have held that a policy of inadequate discipline of police officers could evidence deliberate indifference to the constitutional rights of citizens, those courts have emphasized that "it is nearly impossible to impute

---

[11]     Count XI in Plaintiffs' Complaint is labeled "4th Amendment Violation - Excessive Force (vs. the Sheriff in His Official Capacity Based on a Custom)," however, the actual allegations within this count are identical to Count III and involve car searches.

lax disciplinary policy to [a municipality] without showing a pattern of abuses that transcends the error made in a single case." *Piotrowski v. City of Houston*, 237 F.3d 567, 581-82 (5th Cir. 2001); *see also Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989) (rejecting the assertion that the "failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under *Monell*."). The Seventh Circuit has held that in order to establish municipal liability in the absence of an express policy, a plaintiff must establish "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Robles v. City of Fort Wayne*, 113 F.3d 732 (7th Cir. 1997), quoting *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir. 1997). With respect to the wrongful seizure or excessive force bases of their Fourth Amendment claims, no such evidence is offered. The wrongful seizure and excessive force claims against Sheriff Sheahan are, therefore, dismissed.

## C.     Deliberate Indifference

Without respect to the violation of Plaintiff Reitz's Eighth Amendment rights, Plaintiffs attempt to establish municipal liability on a failure-to-train theory. In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court upheld the imposition of section 1983 municipal liability on the basis of inadequate police training "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. The Court held that the alleged failure to train or supervise must be closely related to the ultimate injury and that the plaintiff must "prove that the deficiency in training actually caused [the constitutional violation]." *Id.* To meet this test, the Seventh Circuit has required plaintiff to show "that the defendants were on notice of constitutional violations committed by their inadequately trained employees." *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir. 1994).

Plaintiffs make no such showing with respect to Ms. Reitz's claim. They urge that the

22

officers' initial inattention to Reitz's medical problem "was the direct and proximate result of the Sheriff's failure to train and/or supervise its officers in a manner such as to distinguish, evaluate and weight [sic] the effect of an emergency medical crisis versus other exigent circumstances." (Count XVI of Am. Compl.) But they have offered no evidence whatever concerning the department's efforts to train deputies on the response to a medical emergency, or the lack of such training. Nor have they presented any evidence that the Sheriff had notice of constitutional violations being committed by his officers. Absent a pattern of violations that would put the Sheriff on notice of the purportedly inadequate training, such that the Sheriff can be said to have manifested "deliberate indifference to the rights of persons with whom the police come into contact." *Hirsch*, 40 F.3d at 904; *Harris*, 489 U.S. at 388, Plaintiffs' claim fails.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Doc. No. 49-1) is granted in part and denied in part. The court grants summary judgment in favor of Defendant on Count I (Search and seizure of car: failure to train or supervise); Counts II (Search and seizure of car: failure to discipline); Count V (Search and seizure of desk drawers and enclosures); Count VI (Search and seizure of "Desks, Drawers and Enclosures": failure to discipline); Count IX (Excessive force: failure to train and/or supervise); Count X (Excessive force: failure to discipline); Count XI (Excessive force: custom); Count XIII (Conversion: failure to discipline); Count XIV (Conversion: custom); and, Count XVI (Eighth Amendment: failure to train and/or supervise). Defendant's motion is denied in respect to Counts I (Search and seizure of car: failure to discipline); Count III (Search and seizure of car: custom); Count V (Search of "Desk, Drawers and Enclosures": failure to train); Count VII (Search of "Desk, Drawers and Enclosures:" custom); and, Count IX (Excessive force: failure to train and/or supervise). Counts IV, VII, XII, XV, and XIV are dismissed. Count III (Search and seizure of car: custom) and Count XII (Search and seizure of "Desks, Drawers and

Enclosures": custom) survive Defendant's motion for summary judgment. The court notes that the

damages, if any, flowing from those alleged violations that remain at issue appear to be modest,

and urges the parties to attempt to resolve their differences.

ENTER:

Dated: November 23, 2004

REBECCA R. PALLMEYER
United States District Judge